UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA KAY WAGES,<br><br>             Plaintiff,<br><br>       v.<br><br>MARTIN O'MALLEY, Commissioner of Social Security,[1]<br><br>             Defendant. | Case No. 1:23-cv-00270-BAM<br><br>**ORDER REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>(Docs. 16, 18.) |

**INTRODUCTION**

Plaintiff Pamela Kay Wages ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income under Title XVI of the Social Security Act. The parties' briefing on the motion was submitted, without oral argument, to Magistrate Judge Barbara A. McAuliffe. (Docs. 16, 18, 19.)[2]

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley is substituted for Kilolo Kijakazi as Defendant in this suit.

[2] The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, including entry of final judgment, pursuant to 28 U.S.C. § 636(c). (Docs. 8, 20, 21.)

1

Having considered the parties' briefs, along with the entire record in this case, the Court finds that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence in the record and is based upon proper legal standards. Accordingly, this Court will affirm the agency's determination to deny benefits.

## FACTS AND PRIOR PROCEEDINGS

Plaintiff applied for Title XVI Supplemental Security Income on December 22, 2017, alleging that she became disabled on March 1, 2016. AR 311-317, 318-322.[3] Plaintiff's application was denied initially on July 16, 2018, and on reconsideration on November 2, 2018. AR 143-48; 152-57. Plaintiff requested a hearing before an administrative law judge ("ALJ") and ALJ Bryan Henry held a hearing on August 26, 2021. AR 80-111. ALJ Henry then held an additional hearing on February 25, 2022, where Plaintiff was represented by counsel. AR 44-78. At the hearing, Plaintiff requested the ALJ amend the alleged onset date to December 21, 2017, and the ALJ granted and amended the alleged onset date. AR 54-55. ALJ Henry issued an order denying benefits on the basis that Plaintiff was not disabled on March 15, 2022. AR 8-33. Plaintiff sought review of the ALJ's decision, which the Appeals Council denied. AR 1-7. This appeal followed.

**August 26, 2021 Hearing Testimony**

ALJ Bryan Henry held a telephonic hearing on August 26, 2021. AR 80-111. Plaintiff appeared on her own behalf. *Id.* Daniel Best, an impartial vocational expert, also appeared. The ALJ began by discussing Plaintiff's right to representation and noting that Plaintiff had previously had a representative who withdrew in August 2019. AR 85-90. The ALJ then discussed the hearing process and explained which medical records he had and noted that he had no medical records from August 2020 through August 2021. AR 90-97. Plaintiff then requested a postponement to find counsel who would represent her and to ensure that the ALJ received all relevant medical records, which the ALJ granted. AR 97-98. The ALJ then discussed Plaintiff's medical providers and how to obtain Plaintiff's medical records. AR 99-111.

---

[3] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

**February 25, 2022 Hearing Testimony**

ALJ Bryan Henry held a telephonic hearing on February 25, 2022. AR 44-78. Plaintiff appeared with her attorney, Amy Kendrick. *Id.* Pat Pauline, an impartial vocational expert, also appeared and testified. AR 69-76. The ALJ began by admitting exhibits 1A to 4A, 1B to 30B, 1D to 26D, 1E to 43E, and 1F to 21F. AR 49. Plaintiff's attorney began by noting that Plaintiff would turn 50 in October 2022 and that Plaintiff intended to amend her alleged onset date to December 21, 2017. AR 52. Plaintiff requested the ALJ amend the alleged onset date to December 21, 2017, and the ALJ granted and amended the alleged onset date. AR 54-55.

Plaintiff's attorney opened by discussing the neuropathy in Plaintiff's hands and feet. AR 55. The ALJ asked where the record showed Plaintiff had severe neuropathy, and Plaintiff's attorney specified that it was in Exhibit 17F at page 14, the NCS showed severe sensory neuropathy and severe left motor neuropathy. AR 56. Plaintiff's attorney further noted that prior to 2021, there were just Plaintiff's complaints of numbness in her feet but no testing. *Id.* Plaintiff's attorney continued that while the medications initially helped Plaintiff improve, the medications later became less effective for Plaintiff. AR 57. Plaintiff's attorney clarified that there were no testing related to neuropathy prior to February 2021 that provided objective findings beyond Plaintiff's complaints. *Id.* Plaintiff's attorney further highlighted 2021 imaging of Plaintiff's spine that showed moderate and severe stenosis. AR 57-58. Plaintiff's attorney summarized that Plaintiff would not be able to stay in any position to effectively complete a workday. AR 58.

Upon examination by the ALJ, Plaintiff testified that she did not live with anyone and did not have a driver's license. AR 59-60. Plaintiff further testified that she had frequent headaches, had problems with her stomach, and had pain in her back. AR 60. She testified that no doctor had recommended surgery for her back or neck. *Id.* Plaintiff noted that she still smoked two cigarettes a day and smoked marijuana "as much as [she] can because it helps with [her] pain." *Id.* Plaintiff testified that she usually feels pain in her spine or entire back, and it would hurt her to lay or stand up or to turn. AR 61. Plaintiff testified that it would take her a long time to pick something up and she always feels stabbing, moving pain or "needles" in her hands and feet. *Id.* She stated that she can walk about twenty steps before needing to stop to catch her breath and could lift at most five pounds.

*Id.* Plaintiff said that if she started lifting more than five pounds, the lower part of her spine and hands would hurt. *Id.* Plaintiff testified that she had not received any injections in her back or neck. AR 61-62. She testified that she had not received treatment other than a prescription of Gabapentin, but that prescription or dosage did not help with the pain. AR 62. Plaintiff also testified that she took Lisinopril, Sertraline, Abilify, Quetiapine, and Metformin, and did not feel side effects from these medications. AR 62-63.

Upon examination by her attorney, Plaintiff testified that she could stand for five minutes or less at a time due to pain in her legs. AR 64. Plaintiff testified that her sister drives her to doctor's appointments but she is able to get from the front of the doctor's office to her appointment by herself. AR 64-65. Plaintiff testified that the pain preventing her from standing for more than five minutes at a time began approximately three or four years ago. AR 65. Plaintiff said that she could sit up for approximately three minutes at a time. AR 65-66. Plaintiff testified that when she needed to sit up to eat or do other tasks, she would put pillows behind her back and lay back and would elevate her legs above her heart to prevent pain or numbness. AR 66. Plaintiff said that she avoided carrying unnecessary items to avoid back pain. AR 67. Plaintiff testified that she could keep her living area clean but could not cook beyond heating something up in the microwave. *Id.* Plaintiff testified that laying down is the only position she can be in without feeling pain, but she dislikes laying down. AR 68.

Upon further examination by the ALJ, Plaintiff testified that she last used methamphetamine approximately two to three years ago. *Id.* Plaintiff further testified that she has problems with her wrists and that her wrists pop when she grasps something. AR 68-69. She said that she has tingling or numbness in her hands but that no doctor has recommended treatment or surgery for her hand issues. AR 69. Plaintiff said that she did not recall any doctor talking to her about carpal tunnel syndrome, though she had recently had nerve testing on her wrists. *Id.*

Following Plaintiff's testimony, the ALJ elicited testimony from vocational expert ("VE") Pat Pauline. AR 69-76. The VE testified that her resume correctly reflected her professional qualifications, that she had not discussed the merits of the case prior to the hearing, and that she had reviewed evidence related to Plaintiff's work history. AR 70. The VE further testified that she would

be able to give impartial and neutral opinions, that she was familiar with Social Security's regulatory definitions of work by skill and exertional level, and that she was familiar with jobs that existed in the national economy. AR 71. The VE also stated that if she gave an opinion that conflicted with the Dictionary of Occupational Titles, she would need to identify the conflict and the basis for her opinion. *Id.* Plaintiff's counsel stated that he did not have any objections to the VE's qualifications. *Id.*

The VE classified Plaintiff's past work as Cleaner, Housekeeper (DOT No. 323.687-014, SVP 2, light, unskilled work, with 195,000 jobs nationally). AR 71-72. The ALJ then noted that he would not count Plaintiff's previous job as a packer in her past work as Plaintiff only worked in that role during September 2015. AR 72.

The ALJ then asked the VE hypothetical questions. For the first hypothetical, the ALJ asked the VE to consider a hypothetical person with the same age, education, and work experience as Plaintiff who: could occasionally lift and carry 20 pounds; could frequently carry ten pounds; could sit for approximately six hours in an eight-hour day; could stand and walk approximately four hours in an eight-hour day; could occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could occasionally balance as part of their job requirements; could occasionally stoop, crouch, kneel, and crawl; could occasionally reach overhead bilaterally; could handle, finger, and feel bilaterally on a frequent basis; could have occasional exposure to extreme cold; could have occasional exposure to fumes, odors, and/or irritants; could never work around unprotected heights or moving and/or dangerous machinery; could tolerate moderate levels of noise; would need to avoid bright lights that are in excess of retail and office type lighting; and would be limited to perform work that consists of only simple, routine, repetitive tasks. AR 72-73. The VE testified that such an individual could not perform the Housekeeper position. AR 73. The VE further testified that there were examples of jobs in the seated, light, unskilled category that would fit the hypothetical, including: Office Helper (DOT No. 239.567-010, SVP 2, light work, with approximately 10,500 jobs nationally); Router (DOT No. 222.587-038, SVP 2, light work, with approximately 31,500 jobs nationally); and Collator (DOT No. 208.685-010, SVP 2, light work, with approximately 40,000 jobs nationally). *Id.*

For the second hypothetical, the ALJ added the limitation that the hypothetical individual could only have occasional contact with the public to the conditions of the first hypothetical individual. *Id.* The VE testified that there would be no change, erosion, or elimination of the three job examples given by the VE in response to the first hypothetical. *Id.* The VE then stated that employers customarily do not tolerate their employees to be off task for more than 15 percent of the day. *Id.* The VE testified that employers tolerate no more than one unexcused or unscheduled absence per month, such as getting to work late or leaving work early. AR 74. The VE further testified that employers customarily permit three routine rest or break periods per day, including two 15-minute breaks and a meal break of typically 45 minutes. *Id.* The VE then stated that exceeding these limits on a regular basis would eliminate all jobs in a competitive workplace. *Id.* The VE testified that her testimony is consistent with the Dictionary of Occupational Titles and the Selected Characteristics of Occupations, but the ALJ relied upon professional experience in picking jobs based on how they were performed related to the combination of sitting and standing. The VE testified that she also used her professional experience in assessing employers' off-task tolerance, employers' absenteeism tolerance, employers' break period allowances, and limitation on bright lights in the ALJ's hypotheticals. AR 74-75.

Plaintiff's attorney then asked the VE if the jobs listed by the VE in the first two hypotheticals would still be available if the hypothetical individual would need a sit/stand option throughout the workday, which would allow the employee to sit and stand at will. AR 75. The VE testified that at-will sitting and standing options would be work-preclusive as they would be too disruptive, and the employee would be off-task. *Id.* The VE then testified that if the hypothetical individual from the ALJ's hypotheticals were limited to standing only two hours of the workday, there would still be seated light production work that does not involve standing. *Id.* The VE then testified that there would still be sedentary work if a limitation of needing to elevate the bilateral lower extremity was added to the hypothetical. AR 76.

**Medical Record**

The relevant medical record was reviewed by the Court and will be referenced below as necessary to this Court's decision.

///

**The ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff was not disabled under the Social Security Act. AR 8-26. Specifically, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of December 21, 2017. AR 13. The ALJ identified the following severe impairments: diabetes mellitus type II; diabetic neuropathy; degenerative disc disease of the cervical spine; degenerative disc disease of the lumbar spine; bilateral carpal tunnel syndrome. *Id.* The ALJ additionally evaluated and discussed other impairments that did not constitute severe medically determinable impairments, including hypothyroid, incipient cataracts of the bilateral eyes, asthma, migraine headache disorder, nicotine misuse disorder, cannabis misuse disorder, and narcissism and antisocial personality features disorder. AR 13-15. The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments. AR 18-19.

Based on a review of the entire record, the ALJ found that Plaintiff retained the RFC to perform light work with the limitations that Plaintiff could: stand and walk for four hours total in an eight-hour workday; could occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could occasionally balance as part of her job requirements; could occasionally stoop, kneel, crouch, and crawl; could occasionally reach overhead bilaterally; could frequently handle, finger, and feel bilaterally; could have occasional exposure to extreme cold; could have occasional exposure to fumes, odors, and/or pulmonary irritants; could never work around unprotected heights and moving and/or dangerous machinery; could tolerate moderate levels of noise; must avoid bright lights, defined as in excess of retail and office-type lighting; was limited to performing work that only consists of simple, routine, repetitive tasks; and was limited to occasional contact with the public. AR 19. The ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as "medical opinion(s) and prior administrative medical finding(s)." AR 19-24.

Given this RFC, the ALJ found that Plaintiff had no past relevant work, but found that there were jobs that exist in the national economy that Plaintiff could perform. AR 24. The ALJ noted that examples of jobs at the light work level consistent with Plaintiff's RFC included: (1) Office Helper

(DOT No. 239.567-010, light work, SVP 2, approximately 10,500 jobs in the national economy); (2) Router (DOT No. 222.587-038; light work; SVP 2; with approximately 31,500 jobs in the national economy); and (3) Collator Operator (DOT No. 208.685-010; light work; SVP 2; approximately 40,000 jobs in the national economy). AR 24-25. The ALJ also found that the VE's testimony was consistent with the Dictionary of Occupational Titles, except for the VE's testimony regarding additional information such as positions for the jobs that do not require more than four hours of standing or walking and overhead reaching requirements, which the VE based on the VE's education, training, and professional experience. AR 25. The ALJ therefore concluded that Plaintiff had not been disabled from December 21, 2017, through the date of the decision. *Id.*

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §

1382c(a)(3)(A).  A claimant must show that he or she has a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

## **DISCUSSION**[4]

Plaintiff contends that the ALJ improperly discounted the opinion of Brigit Siekerkotte, M.D., without setting forth specific, legitimate reasons for doing so.  (Doc. 16 at 10-19; Doc. 19 at 1-5.)  Defendant in turn argues that the ALJ appropriately evaluated Dr. Siekerkotte's opinion with reference to the supportability and consistency factors.  (Doc. 18 at 4-8.)

Because Plaintiff applied for benefits after March 27, 2017, her claim is governed by the agency's new regulations concerning how an ALJ must evaluate medical opinions.  20 C.F.R. § 416.920c.  Under the new regulations, the Commissioner does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a).

The Commissioner evaluates the persuasiveness of the medical opinions based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  C.F.R. § 416.920c(c)(1)-(5).  Supportability and consistency are the most important factors.  20 C.F.R. § 416.920c(b)(2).

Ninth Circuit case law preceding the new regulations afforded deference to the medical opinions of treating and examining physicians.  Indeed, prior to the current regulations, the Ninth Circuit required ALJs to provide clear and convincing or specific and legitimate reasons for rejecting

---

[4] The parties are advised that this Court has carefully reviewed and considered all of the briefs, including arguments, points and authorities, declarations, and/or exhibits.  Any omission of a reference to any specific argument or brief is not to be construed that the Court did not consider the argument or brief.

the medical opinions of treating or examining physicians. Contrary to Plaintiff's suggestion, these standards of articulation no longer apply in light of the new regulations, and the ALJ was not required to provide "specific and legitimate reasons" to discount the medical opinions. *See Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022) (finding revised social security regulations "clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant"). However, the Ninth Circuit has clarified that "under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Id.* "The agency must 'articulate ... how persuasive' it finds 'all of the medical opinions' from each doctor or other source, . . . and 'explain how [it] considered the supportability and consistency factors' in reaching these findings." *Id.* (internal citations omitted); *see* 20 C.F.R. § 404.1520c(c). In this context,

> Supportability means the extent to which a medical source supports the medical opinion by explaining the "relevant ... objective medical evidence. Id. § 404.1520c(c)(1). Consistency means the extent to which a medical opinion is "consistent ... with the evidence from other medical sources and nonmedical sources in the claim. Id. § 404.1520c(c)(2).

*Id.* at 791-92.

On October 10, 2018, Birgit Siekerkotte, M.D., completed a comprehensive internal medicine evaluation. AR 724-729. In the medical source statement portion of the evaluation, Dr. Siekerkotte opined that Plaintiff was able to stand or walk up "to six hours slowly with breaks;" had no limitations in sitting capacity; needed no ambulatory device; was able to lift 50 pounds occasionally and 25 pounds frequently with proper technique; could frequently climb, frequently balance, frequently stoop, frequently kneel, frequently crawl, and occasionally crouch; had no manipulative activity limitations; and had no workplace environmental exposure limitations. AR 728. Dr. Siekerkotte diagnosed Plaintiff with diabetes neuropathy and back pain. *Id.*

In the physical exam portion of the evaluation, Dr. Siekerkotte noted that Plaintiff is a well-developed, well-nourished female in no acute distress;" and provided neck findings: "Supple without adenopathy, thyromegaly, or masses. There are no palpable cervical, supraclavicular, epi trochlear, or axillary lymph nodes." AR 726. Dr. Siekerkotte further found that Plaintiff's extremities were "warm without cyanosis, clubbing or edema." AR 727. Regarding Plaintiff's coordination, station, and gait,

Dr. Siekerkotte found: "Normal gait. Normal Romberg testing. The claimant is able to stand on toes, heels, and one leg alone. She can squat one-third of the way down." *Id.* Dr. Siekerkotte also included range of motion findings for Plaintiff's Spine ("Cervical region: Flexion 0-50 degrees and extension 0-60 degrees. Lateral flexion 0-45 degrees and rotation 0-80 degrees bilaterally"); Lumbar region ("Flexion 0-90 degrees and extension 0-25 degrees. Lateral flexion 0-25 degrees bilaterally"); Hip ("Forward flexion 0-10 0 degrees, backward extension 0-30 degrees, rotation-internal 0-40 degrees, rotation-external 0-50 degrees, abduction 0-40 degrees, and adduction 0-20 degrees bilaterally"); Knee ("Extension zero degrees and flexion 150 degrees bilaterally"); Ankle ("Dorsiflexion 0-20 degrees and plantar flexion 0-40 degrees bilaterally"); Shoulder ("Forward flexion 0-150 degrees, extension 0-40 degrees, abduction 0-150 degrees, adduction 0-30 degrees, internal rotation 0-80 degrees, and external rotation 0-90 degrees bilaterally"); Elbow ("Flexion-extension 0-150 degrees, supination 0-80 degrees, and pronation 0-80 degrees bilaterally."); Wrist ("Extension 0-60 degrees, flexion 0-60 degrees, radial deviation 0-20 degrees, and ulnar deviation 0-30 degrees bilaterally"); and Finger/Thumb ("Thumb: Extension-flexion MCP 0-70 degrees and IP 0-90 degrees bilaterally. Fingers: Extension-flexion MCP 0-90 degrees, PIP 0-100 degrees, and DIP 0-70 degrees bilaterally"). AR 727. Dr. Siekerkotte further found that the straight leg raising test was: "Negative on the left in seated and supine position. Negative on the right in supine position, negative on the right in seated position with the claimant having right thigh pain." AR 727-28. Related to Plaintiff's motor strength, muscle bulk, and muscle tone, Dr. Siekerkotte observed: "Left quadriceps 5-/5, right 5/5. Bilateral biceps, shoulders, dorsiflexion, and plantar flexion 5/5." AR 728. Dr. Siekerkotte further noted that there was "tenderness over the entire back to light touch," and on "the entire right side of the body, including the face, the claimant perceives touch as painful." *Id.*

In evaluating Dr. Siekerkotte's opinion, the ALJ summarized Dr. Siekerkotte's findings and reasoned as follows:

> The undersigned finds the opinions of Brigit Siekerkotte, MD, who conducted an internal medicine consultative examination on October 10, 2018, mostly persuasive. Dr. Siekerkotte opined that the claimant can stand/walk up to six hours, lift and carry 50 pounds occasionally and 25 pounds frequently, occasionally climb, balance, stoop, kneel, and crawl, and occasionally crouch (9F/5). The undersigned finds these opinions

> generally persuasive because they are well supported by this doctor's physical exam findings, which are generally mild (9F/3-5). They are also generally consistent with the current and complete record as a whole, including the physical exam findings demonstrating normal gait and coordination, grossly normal motor strength, and grossly normal musculoskeletal range of motion; as well as the treatment notes generally demonstrating adequate control of diabetes mellitus with medication (4F/57; 9F/4-5; 11F/158, 171; 12F/19, 28, 31, 35, 39, 47, 58, 70; 14F/17; 17F/1-2, 21, 30, 31; 19F/3; 20F/45, 51, 62, 68; 21F/8, 52).
>
> On the other hand, Dr. Siekerkotte opined that the claimant is limited to walking slowly and with breaks. The undersigned notes that these limitations are vague as to the most that the claimant can do on a function-by-function basis, as the speed of walking and the length and frequency of breaks are not defined. However, to the extent that these opinions suggest greater standing and/or walking limitation than as stated in the residual functional capacity, the undersigned finds them unpersuasive because they are not well-supported by this doctor's physical exam findings, which do not suggest the need for greater walking and standing limitation than up to four hours total in an eight-hour workday with normal breaks (9F/3-5). They are also inconsistent with the current and complete record as a whole, which likewise does not demonstrates more extensive standing and/or walking limitation, including the physical exam findings demonstrating normal gait and coordination, grossly normal motor strength, and grossly normal musculoskeletal range of motion; as well as the treatment notes generally demonstrating adequate control of diabetes mellitus with medication (4F/57; 9F/4-5; 11F/158, 171; 12F/19, 28, 31, 35, 39, 47, 58, 70; 14F/17; 17F/1-2, 21, 30, 31; 19F/3; 20F/45, 51, 62, 68; 21F/8, 52).

AR 23-24.

The Court finds that the ALJ properly evaluated Dr. Siekerkotte's opinion under the new regulations.  First, the ALJ noted that Dr. Siekerkotte's "limitations are vague as to the most that the claimant can do on a function-by-function basis, as the speed of walking and the length and frequency of breaks are not defined."  AR 23.  The ALJ also found that Dr. Siekerkotte's opinion that Plaintiff was limited to walking slowly and with breaks was "not well-supported by this doctor's physical exam findings, which do not suggest the need for greater walking and standing limitation than up to four hours total in an eight-hour workday with normal breaks."  AR 23 (citing AR 726-728).  The ALJ's reasoning invokes the supportability factor, which means the extent to which a medical source supports the medical opinion by explaining the "relevant ... objective medical evidence." 20 C.F.R. §

12

416.920c(c)(1); *Woods v. Kijakazi*, 32 F.4th 785, 791-92 (9th Cir. 2022). The ALJ's reasoning regarding vagueness is supported by reference to Dr. Siekerkotte's treatment notes, which state that the Plaintiff may walk up "to six hours slowly with breaks," but does not clarify the length or frequency of breaks required, nor the speed Plaintiff may "slowly" walk at. AR 728. The ALJ also found that Dr. Siekerkotte's physical exam findings do not support Dr. Siekerkotte's conclusion that Plaintiff required greater walking and standing limitation than up to four hours total in an eight-hour workday with normal breaks. AR 23; 724-729. In reviewing the physical exam findings, the ALJ highlighted Dr. Siekerkotte's findings that tests related to coordination, station, and gait showed a normal gait, normal Romberg testing, the ability to stand on toes, heels, and one leg alone, and the ability to squat one-third of the way down. AR 727. The ALJ also noted that Dr. Siekerkotte's findings showed a generally normal musculoskeletal range of motion and motor strength. AR 23, 727 (normal range of motion findings for spine, hip, knee, ankle, shoulder), 728 (motor strength findings note: "left quadriceps 5-/5, right 5/5."). By comparing Dr. Siekerkotte's physical examination findings with Dr. Siekerkotte's opined limitations, the ALJ appropriately addressed the supportability factor.

Second, the ALJ found that Dr. Siekerkotte's opinion was "also inconsistent with the current and complete record as a whole, which likewise does not demonstrates [*sic*] more extensive standing and/or walking limitation, including the physical exam findings demonstrating normal gait and coordination, grossly normal motor strength, and grossly normal musculoskeletal range of motion; as well as the treatment notes generally demonstrating adequate control of diabetes mellitus with medication." AR 23-24 (citations omitted). The ALJ's reasoning invokes the consistency factor, which means the extent to which a medical opinion is "consistent ... with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 416.920c(c)(2). Examination of the record confirms the ALJ's evaluation that the record demonstrates relatively normal exam findings related to gait, motor strength, and musculoskeletal systems despite Plaintiff's ongoing diabetes mellitus. AR 641 (May 12, 2018 medical record noting normal motor exam, extremities, and appearance findings); 727-728 (October 10, 2018 physical exam findings from Dr. Siekerkotte noting diabetes diagnosis but generally normal findings for range of motion, motor strength, coordination,

station, and gait); 891 (November 13, 2018 medical report noting ongoing diabetes but generally normal findings for general appearance, musculoskeletal, extremities, neck, and "no edema."); 904 (October 22, 2018 clinic note noting ongoing diabetes but generally normal findings for general appearance, musculoskeletal, extremities, neck, and "no edema"); 932 (August 28, 2019 medical report noting normal extremities findings, generally normal systems findings, and Plaintiff "denies any lower extremity edema"); 941 (May 7, 2019 medical report showing normal findings for appearance, neck, extremities, and motor strength); 944 (March 28, 2019 clinic note noting "Type 2 diabetes with Alc 7.6" but normal motor findings); 948 (February 27, 2019 clinic note noting "Type 2 diabetes mellitus Alc. 7.6 <- 7.7 <-11.2 from 12.2 – on insulin, but discontinue due to hypoglycemia" and "Neuropathy secondary to above." Physical exam showed no edema in extremities and motor exam findings were "5/5 bilateral upper and lower extremity."); 952 (January 30, 2019 clinic note noting "Type 2 diabetes mellitus" and neuropathy but showing normal appearance findings, no edema in extremities, and motor exam findings of "5/5 bilateral upper and lower extremity."); 960 (November 5, 2018 clinic note noting "Motor exam: intact" and "Extremities: No lower extremity edema"); 971 (August 20, 2018 physical exam report noting use of insulin and showing normal findings for appearance, no edema, and "5/5 bilateral upper and lower extremity" for motor exam); 983 (September 19, 2017 physical exam report noting "DM" in past medical history, normal appearance findings, no edema, and normal musculoskeletal findings); 1030 (February 18, 2020 clinic note noting "Type 2 diabetes mellitus with unspecified complications" but no edema); 1146-47 (June 29, 2021 progress note noting "Diabetes type 2, uncontrolled," but Plaintiff denied hypoglycemia, symptoms of hyperglycemia, and "numbness, tingling, pain in feet"); 1166 (August 25, 2021 clinic note noting "Diabetes type 2, uncontrolled" and "lower leg extremity +4 bilaterally, tenderness to right ankle upon palpation due to previous history of dog bite in that area," but "No bilateral leg edema noted [and] [g]ait normal"); 1175-76 (January 5, 2021 clinic note noting Diabetes type 2 uncontrolled and neuropathy but normal constitutional findings; "5/5 [motor strength] throughout in upper and lower extremities;" and normal gait, station, base, stance, arm swing, and stride"); 1279 (progress note noting diabetes type 2 uncontrolled and neuropathy but stating that Plaintiff denied numbness, tingling, or pain in feet); 1380 (March 16, 2019 medical report noting relatively normal physical

1  examination findings); 1386 (November 24, 2019 medical report noting "Normal ROM, normal
2  strength" in musculoskeletal findings); 1397 (medical report noting "Normal ROM, normal strength");
3  1403 (August 18, 2021 medical report noting "Normal ROM, normal strength, no tenderness, no
4  swelling, no deformity"); 1505 (January 24, 2022 clinic noting type 2 diabetes mellitus uncontrolled
5  and with musculoskeletal findings noting "Normal range of motion and strength," and "no tenderness
6  or swelling"). The Court therefore finds that the ALJ adequately discussed the consistency factor in
7  discounting Dr. Siekerkotte's opinion.

8  Plaintiff first argues that the ALJ's discussion of the supportability factor is inadequate because
9  the ALJ did not sufficiently articulate what was vague about Dr. Siekerkotte's opinion. (Doc. 16 at
10 12-13.) In support, Plaintiff cites district court cases in which courts found that the ALJs'
11 characterization of medical opinions as "vague" was insufficient to support their evaluation of the
12 medical opinion. *See Thompson v. Comm'r of Soc. Sec. Admin.*, No. CV-22-08067-PCT-SPL, 2023
13 WL 4117492 (D. Ariz. June 22, 2023); *Kimberli M. S. v. Kijakazi*, No. 21-cv-1836-AJB-MDD, 2023
14 WL 2346330, (S.D. Cal. Mar. 3, 2023), report and recommendation adopted, No. 21-cv-01836-AJB-
15 MDD, 2023 WL 8696370 (S.D. Cal. Apr. 11, 2023).

16 In *Thompson*, the district court noted that the ALJ's characterization of a medical assessment
17 as "vague and imprecise" "simply does not identify which aspects of the assessments would be served
18 by further clarification." *Thompson*, 2023 WL 4117492, at *5. Similarly, in *Kimberli M.S.*, the ALJ
19 simply wrote that the medical opinion was "quite vague as to what extent the limitations affect the
20 claimant's abilities." *Kimberli M. S.*, 2023 WL 2346330, at *8. The district court in *Kimberli M.S.*
21 found that the ALJ "insufficiently articulated this evaluation of" the medical opinion because the
22 "swift evaluation of [the medical] opinion does not allow the Court to trace the path of the ALJ's
23 reasoning." *Id.*

24 The ALJ's characterization of the opinion as "vague" here is distinguishable from the ALJs'
25 characterizations in the cases Plaintiff relies upon. While the ALJs in those cases used conclusory
26 language without clarifying which parts of the opinions were vague, the ALJ here specified that the
27 "limitations are vague as to the most that the claimant can do on a function-by-function basis, as the
28 speed of walking and the length and frequency of breaks are not defined." AR 23. The ALJ identified

that Dr. Siekerkotte's opinion was imprecise as to the speed of walking and length and frequency of breaks and allowed the Court to trace his reasoning in discounting Dr. Siekerkotte's opined limitations regarding standing and walking. *See Kimberli M. S.*, 2023 WL 2346330, at *8. The ALJ's characterization of Dr. Siekerkotte's opinion as "vague" is therefore appropriately discussed in relation to the supportability factor, and Plaintiff's argument is unavailing.

Plaintiff further contends that the ALJ's discussion of the supportability factor is inadequate because the ALJ mischaracterized the evidence. (Doc. 16 at 13-15.) Plaintiff instead highlights some favorable notes and findings in Dr. Siekerkotte's opinion. (Doc. 16 at 13-14.) Dr. Siekerkotte wrote that "Diabetes neuropathy is present for 4-5 years" and that "claimant states she has numbness in both hands and feet and both are burning and hurting all the time." AR 725. Dr. Siekerkotte further noted that Plaintiff "can squat one-third of the way down" and that the Straight Leg Raising test was "negative on the right in seated position with the claimant having right thigh pain." AR 727-28. Plaintiff, however, ignores the relevant but less favorable portions of Dr. Siekerkotte's findings cited by the ALJ in support of his analysis, including findings that Plaintiff had a normal gait, normal Romberg testing, the ability to stand on toes, heels, and one leg alone, normal musculoskeletal range of motion, and normal motor strength. AR 726, 727 (normal range of motion findings for spine, hip, knee, ankle, shoulder), 728 (motor strength findings note: "left quadriceps 5-/5, right 5/5."). In reviewing Dr. Siekerkotte's opinion, it does not appear that the ALJ mischaracterized the evidence but instead highlighted the most relevant evidence regarding Plaintiff's ability to walk and stand. Furthermore, while Plaintiff attempts to substitute her own characterization of the evidence for that of the ALJ, "the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing *Andrews v. Shalala*, 53 F.3d 1025, 1039-40 (9th Cir. 1995)). To the extent that there is any ambiguity in Dr. Siekerkotte's opinion between the findings cited by the ALJ and the findings cited by Plaintiff, the ALJ is the final arbiter in resolving that ambiguity. Plaintiff is therefore incorrect in arguing that the ALJ mischaracterized Dr. Siekerkotte's findings in examining the supportability factor.

In her supportability factor argument, Plaintiff also cites findings from the record beyond Dr. Siekerkotte's report to show the ALJ mischaracterized the evidence. (Doc. 16 at 14-15.) However,

16

the supportability factor addresses "the extent to which a medical source supports the medical opinion by explaining the 'relevant ... objective medical evidence.'" *Woods*, 32 F.4th at 791–92 (citing 20 C.F.R. § 404.1520c(c)(1)). Whether Dr. Siekerkotte's opinion is consistent with evidence from other medical sources goes to the consistency factor, and therefore does not support Plaintiff's supportability factor argument. *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(c)(1)) ("Consistency means the extent to which a medical opinion is 'consistent ... with the evidence from other medical sources and nonmedical sources in the claim.'"). Plaintiff's argument that the ALJ mischaracterized evidence while evaluating the supportability factor is therefore unavailing. Accordingly, the ALJ did not err in his analysis of the supportability factor when evaluating Dr. Siekerkotte's opinion.

Plaintiff further argues that the ALJ's evaluation of the consistency factor created harmful error due to the ALJ's "cherry-picking of evidence." (Doc. 16 at 15-19.) Plaintiff contends that the ALJ's references to normal gait and coordination, grossly normal motor strength, and grossly normal musculoskeletal range of motion do not sufficiently explain how the consistency factor demonstrated Dr. Siekerkotte's opinion was unpersuasive. (Doc. 16 at 17.)

Plaintiff correctly notes that the ALJ may not cherry-pick evidence in evaluating a medical opinion. *See Peek v. Kijakazi*, No. 1:21-cv-01828-HBK, 2023 WL 3062107, at *5 (E.D. Cal. Apr. 24, 2023) (citing *Buethe v. Comm'r of Soc. Sec.*, 2021 WL 1966202, at *4 (E.D. Cal. May 17, 2021)); *Cruz v. Kijakazi*, No. 1:21-cv-01248-AWI-HBK, 2023 WL 1447855, at *5 (E.D. Cal. Feb. 1, 2023) ("Even under the new regulations, the ALJ may not 'cherry-pick' evidence in discounting a medical opinion."). When district courts have analyzed arguments regarding cherry-picking, they have examined whether the ALJ appropriately reviewed the record as a whole. *See Cruz*, 2023 WL 1447855, at *5 ("However, as part of the summary of medical evidence in the decision, the ALJ did review 'objective findings, diagnostic studies, treatment modalities, and the treatment record as a whole,' including ongoing evidence…that could be considered favorable to Plaintiff… Thus, when viewing the medical record as a whole, it was reasonable for the ALJ to conclude that the severity of limitations assessed… were not consistent with objective medical evidence in the record."); *Sapien v. Kijakazi*, No. 1:22-cv-00553-BAM, 2023 WL 3601571, at *3 (E.D. Cal. May 23, 2023) ("when

viewing the medical record as a whole, it was reasonable for the ALJ to conclude that the limitations in fingering and handling proposed… were not consistent with the overall record.")

Here, the ALJ similarly reviewed the record related to Plaintiff's severe impairments and noted that Plaintiff's "neck, back, neuropathy, and diabetes mellitus impairments limit her ability to stand, walk, lift, carry, and reach overhead, and impose some workplace environmental limitations." AR 22. The ALJ did not ignore the medical record regarding Plaintiff's diabetes mellitus and other impairments, but instead cited to findings over multiple years, discussed how and whether impairments were controlled in his RFC analysis, and explained the degree of limitations the impairments imposed in relation to Plaintiff's ability to walk and stand. *See* AR 21-24; 641; 727-728; 891; 904; 932; 941; 944; 952; 960; 971; 983; 1146-47; 1166; 1175-76; 1279; 1380; 1386; 1403; 1505. Despite Plaintiff's contention that the ALJ's references are insufficiently connected to discounting Dr. Siekerkotte's opinion, the ALJ's citations to normal findings for gait and coordination, motor strength, and musculoskeletal range of motion directly contrast with Dr. Siekerkotte's opinion that Plaintiff had greater limitations in her walking and standing abilities. The contrast between the relatively normal findings and opined greater limitations allow the Court to trace the ALJ's reasoning in discounting Dr. Siekerkote's opinion. When viewing the medical record as a whole, it was reasonable for the ALJ to conclude that the limitations on walking and standing proposed by Dr. Siekerkotte were inconsistent with the broader record. Moreover, the "key question is not whether there is substantial evidence that could support a finding of disability, but whether there is substantial evidence to support the Commissioner's actual finding that claimant is not disabled." *Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997). To the extent Plaintiff suggests an alternative interpretation of the evidence, this is not sufficient to establish reversible error. If the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020), citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Accordingly, the ALJ did not err in assessing the consistency factor when evaluating Dr. Siekerkotte's opinion.

///

///

///

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's motion for summary judgment and her appeal from the administrative decision of the Commissioner of Social Security, and affirms the agency's determination to deny benefits.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Martin O'Malley, Commissioner of Social Security, and against Plaintiff Pamela Kay Wages.

IT IS SO ORDERED.

Dated:     **February 5, 2024**                    /s/ *Barbara A. McAuliffe*           _
                                                    UNITED STATES MAGISTRATE JUDGE